**The STATE of Ohio, Appellee,**

v.

**DUCIC, Appellant.**

[Cite as *State v. Ducic,* 162 Ohio App.3d 721, 2005-Ohio-4291.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 84900.

Decided Aug. 18, 2005.

722

William D. Mason, Cuyahoga County Prosecuting Attorney, and Mark Mahoney, Assistant Prosecuting Attorney, for appellee.

John B. Gibbons, for appellant.

KENNETH A. ROCCO, Judge.

{¶ 1} Defendant-appellant, Mark Ducic, appeals from his convictions on two counts of aggravated murder with specifications and the sentences subsequently imposed upon him.

{¶ 2} Ducic asserts that his convictions are based upon insufficient evidence. He further asserts that his convictions are the result of the admission during trial of improper "other acts" evidence. Lastly, Ducic claims that the trial court failed to comply with statutory requirements in imposing consecutive terms for his convictions.

{¶ 3} After a thorough review of the lengthy record, however, this court cannot agree with Ducic; therefore, his convictions and sentences are affirmed.

{¶ 4} Ducic's convictions result, in part, from his own inability to remain quiet about his role in the deaths of two of his friends. Although both deaths originally seemed accidental, his boasts that he had caused the deaths reopened investigation into them.

{¶ 5} The first death occurred on August 5, 2001. That morning, Ducic informed Marie Miller, his ex-wife, over the telephone that he and his current girlfriend, Barbara Davis, had spent the night at Donald Ehrke's house and that he had awoken to find Davis not breathing but foaming at the mouth. Miller responded frantically; she ordered Ducic to call 911. Ducic indicated he would. Nearly an hour later, Ducic made the call, but by that time, Davis was beyond medical aid; she was pronounced dead at the hospital.

{¶ 6} The subsequent autopsy indicated that Davis had died from a drug overdose, since she had ingested alcohol, Valium, hydrocodone (found in Vicodin), and lethal amounts of oxycodone (found in OxyContin), and cocaine. David Borez, the Euclid police detective assigned to investigate Davis's death, thought some circumstances surrounding it seemed suspicious. First, Ducic did not appear to be upset by his girlfriend's death.

{¶ 7} Indeed, Miller and another female friend arrived on the scene just after Davis's body had been transported and found Ducic unaffected. He even confided to them he wanted a prostitute. Ehrke, in contrast, seemed panicked while he sought to clean his house of drug paraphernalia.

{¶ 8} Since the circle of friends in which Ducic, Davis, and Ehrke moved was highly involved in drug use, Davis's death by overdose was not out of the realm of possibility. Ducic, in particular, seemed to enjoy insisting that his friends indulge in various drugs. Nevertheless, Davis's friends did not know her to use OxyContin, which was one of the drugs found in a lethal amount in her system.

{¶ 9} Ducic, on the other hand, used OxyContin often. Thus, Davis's brother was not alerted when Ducic called him on August 4, 2001, seeking to purchase a highly potent form of the drug. Ducic made the purchase just before he and Davis left for Ehrke's house that night.

{¶ 10} Second, Borez knew that Ducic had waited for some time after discovering Davis's condition before summoning emergency services. Upon speaking with several acquaintances of the couple, Borez found that their relationship was not only violent, but strained.

{¶ 11} For instance, during a recent fight, Ducic struck Davis with a car, injuring her legs. Miller knew that Davis was tired of Ducic's taking her money and letting her take the blame for his drug activities. Moreover, the night before Davis's death, as friends gave them a ride to Ehrke's house, Davis and Ducic argued in the back seat of the car.

{¶ 12} Without any particular evidence of foul play, however, the county coroner ruled Davis's death accidental, and Borez closed the investigation.

{¶ 13} The second death occurred on December 17, 2002. It occurred in the same home as the first; Donald Ehrke was discovered sitting dead in an easy chair in his living room with a remote control in his hand, facing a blank television screen.

{¶ 14} This death also looked suspicious for several reasons. Although Ehrke was obsessive about locking his doors, they were open that morning. His gun collection was missing. Moreover, although Ehrke's medical history indicated that he took several prescription medications and he died from a drug overdose, his stomach contained no tablets, and his system did not contain his prescription

medications. Instead, Ehrke's blood contained significant amounts of codeine, the antidepressant mirtazapine, the muscle relaxant cyclobenzaprine, cocaine, and Vicodin.

{¶ 15} Only one person, Kenny Watson, admitted visiting Ehrke the previous night; Watson noticed that Ehrke was not acting like himself. However, Ducic told his drug supplier, Kenny Frost, before the body was discovered that Ehrke was dead.

{¶ 16} Prescription cough medicine is composed largely of codeine. A few days prior to Ehrke's death, Ducic telephoned Miller to ask her to fill her prescription for Hydromet cough syrup because Ehrke was ill. Miller complied and took the bottle to Ehrke's house. When Ducic later returned the bottle, it was empty. Ducic told her Ehrke drank it, but Miller noticed that Ehrke did not appear to have done so. The autopsy of Ehrke's body indicated that his lungs were infected with pneumonia at the time of his death.

{¶ 17} Significantly, Ehrke was the only other person present in his house besides Ducic when Davis died. Also significantly, approximately a month before Ehrke's death, Ducic learned that an indictment had been issued against him.

{¶ 18} Ducic initially did not know the exact offense with which he was charged; he told his current girlfriend that he assumed Ehrke had "betrayed" him. However, the charge actually was one of stalking his girlfriend. Ducic was arrested for this offense and was released on bond on December 5, 2002. Soon thereafter, Ehrke began to argue with him over a $500 debt. Within days, Ehrke died.

{¶ 19} Ehrke's death raised no immediate investigation; therefore, the county coroner ruled it accidental. Ducic went on with his life at his mother's home, partying with friends and supplying drugs to them.

{¶ 20} One of the friends who reconnected with Ducic in late 2002 was Brad Weiss. Weiss knew Ducic from a previous time in prison together. At the time Weiss rekindled his acquaintance, he worked as a confidential reliable informant to the Cleveland Police Department. Weiss helped law enforcement personnel obtain evidence against some well-respected businessmen who engaged in drug trafficking. Weiss felt no obligation to inform on his friends.

{¶ 21} His situation, however, changed in the spring of 2003. By that time, Weiss had committed several traffic offenses and had unwittingly become involved in a theft of jewelry. These events placed his parole status in jeopardy. Seeking to forestall a return to prison, Weiss told Cleveland Police Detective Greg Whitney, along with Ohio State Pharmacy Board agent Lynn Mudra, that he had heard Ducic bragging about killing two people. Ducic had indicated that no one knew that the murders had been committed.

{¶ 22} Whitney and Mudra checked into Weiss's information. After reviewing the circumstances surrounding the deaths of Davis and Ehrke, they implemented a plan with Weiss. Since Ducic trusted Weiss as a drug user, Weiss was sent to make a series of controlled buys at Ducic's home. Additionally, the jewelry theft was used to make Weiss look desperate for a way to maintain his freedom.

{¶ 23} An electronic device placed on Weiss's person recorded each of his visits to Ducic's house. Weiss made drug purchases there several times during the summer months of 2003. Whitney and Mudra thus not only discovered that Ducic had access to and could provide each of the controlled substances that the victims' bodies contained, but further that Ducic had devised an unsuspected method to kill persons who were known drug users.

{¶ 24} In his conversation with Weiss recorded on June 11, 2003, Ducic advised that all that was necessary was "to plan ahead a little bit." Since Weiss confided that the woman who was going to prosecute him for the theft used OxyContin, Ducic told him that about a month before her desired death, Weiss should "give [her] some Percs, couple some Oxys, then, Bam! All of a sudden, you know, she does a 'hot shot'—bam, she is through—they'll say man, she has been partying for six months; man, it was just an accident."

{¶ 25} Ducic explained that a "hot shot" was an overdose and that he had "this sh– that was included in it." Ducic questioned whether Weiss believed "all these people around me are OD'd by accident?" He went on to boast that "two people around me * * * had it coming" and that he was suspected of causing their deaths, but that "one of the hardest charges to prove is OD."

{¶ 26} The following day, Ducic advised Weiss to introduce him to the woman who planned to prosecute for the theft, so he could have "access to her." Ducic reassured Weiss he could "do her," saying, "I know I can do it. I can do it anytime. I can do something that has been done twice in the last year and a half. I did two of them and they cannot touch me." Ducic made a similar boast on June 17 in a conversation with Weiss, stating that "Barb" and "Don" both died in "Don's house," and that, although he briefly had been in jail, the "cops * * * can't do anything to him."

{¶ 27} On June 28, Ducic repeated his skepticism that Weiss could commit murder, saying, "[T]his is hard core, man; there is [sic] not too many people who can * * * [get] away with two murders in the last year and a half in Euclid and they cannot touch me." Ducic warned Weiss that after committing the act, "they question you," and a person had to know how to act. Ducic "was crying, [he] played it off so good."

{¶ 28} By July 7, 2003, Ducic told Weiss he would do the "hit" for "five thousand." During a conversation recorded on August 1, Ducic asked Weiss

when he wanted it done, told him it was "good" that the intended victim took "Oxys" because an overdose of the "whole bottle" of the "would-be Oxy" he had in storage would not be traceable, and reassured Weiss that if OxyContin were already in the victim's system, her death would not be "suspicious." Ducic encouraged Weiss to think of it as "just an OD."

{¶ 29} Whitney and Mudra took the recordings to the county coroner. After listening to portions of them, she changed her rulings in both Davis's and Ehrke's deaths from accidental to homicide. The detective and the agent also obtained a search warrant for Ducic's home and an arrest warrant for him. Before he knew what the charges against him were, Ducic protested that the death was "not a murder but a manslaughter."

{¶ 30} The grand jury issued an indictment against Ducic that charged him with the following offenses: two counts of aggravated murder, R.C. 2903.01, the first with a course-of-conduct specification, R.C. 2929.04(A)(5), and the second with three additional death-penalty specifications;[1] attempted aggravated murder, R.C. 2903.01/2929.02; conspiracy to commit aggravated murder, R.C. 2903.03/2923.01; and 16 counts of drug trafficking, R.C. 2925.03. Ducic remained in jail pending trial. Even there, he lacked the ability to remain quiet about his role in the deaths of Davis and Ehrke.

{¶ 31} Ducic discussed his case with one of his cellmates, Edward Farrell. He stated that he "had killed two people and one person he had chased down the street with a knife."

{¶ 32} In his conversations with Farrell, Ducic admitted that he "OD'ed [Davis] on a bunch of different types of drugs" because "she was * * * getting ready to go to the * * * police on him," and her death contained some irony because "he got the OxyContin from her brother." He elaborated that he gave her "a bunch of different kinds of narcotics, Percocet, OxyContin, a mixture of stuff," with "crack cocaine."

{¶ 33} Ducic admitted Ehrke's death was "done the exact same way" because "he was afraid that Don was going to go to the police about him because Don knew about him killing Barb." Ducic told Farrell he killed Ehrke "about 16 months later"; Ducic "went to a basement * * * mixed a bunch of stuff together and * * * some of the stuff * * * didn't even show up in the coroner's report." Ehrke was a good friend, though, so "the best thing he could do for him * * * was let him die in his favorite chair."

---

1. These were as follows: a specification that the second aggravated murder was committed to prevent detection of the first, R.C. 2929.04(A)(3), a course-of-conduct specification, R.C. 2929.04(A)(5), and the purposeful-killing-of-a-witness specification, R.C. 2929.04(A)(8).

{¶ 34} Ducic further told Farrell how he would defend himself in court by confiding that he planned to convince the jury that he was merely a big talker who lied about things. Farrell subsequently became a witness against him. When Ducic discovered the betrayal, he told a corrections officer that he knew where Farrell was and that "he was going to have him taken care of"; the corrections officer took his words to be a threat. Ducic's statement later became the basis for an additional indictment against him.[2] The two cases ultimately were joined for trial.

{¶ 35} Ducic's jury trial took nearly a month to complete. After hearing the testimony of the witnesses and reviewing all the evidence presented, the jury returned verdicts of guilty on all counts except one count of drug trafficking. Since the jury subsequently could not reach a unanimous verdict regarding a sentencing recommendation on the two counts of capital murder, the judge sentenced Ducic on these convictions to two consecutive life terms without the possibility of parole. The terms on the remaining counts were ordered to be served concurrently with each other and with the first two counts.

{¶ 36} Ducic presents the following three assignments of error in his appeal:

{¶ 37} "I. The trial court erred by failing to grant the defendant-appellant's motion for judgment of acquittal pursuant to Rule 29(A), Ohio Rules of Criminal Procedure with respect to Counts One and Two of the indictment wherein Mark Ducic was charged with the offenses of aggravated murder with specifications relating to the deaths of Barbara Davis and Donald Ehrke, as the State failed to [present] sufficient evidence that Mark Ducic committed those offenses, beyond a reasonable doubt."

{¶ 38} "II. The trial court erred by permitting the introduction into evidence of highly prejudicial 'other act' testimony.

{¶ 39} "III. The trial judge erred by imposing consecutive sentences and the explanation justifying these sentences was inadequate."

{¶ 40} With respect to his first assignment of error, Ducic claims that the evidence was insufficient to prove that Davis's and Ehrke's deaths were aggravated murders instead of accidents. He essentially contends that since no one actually witnessed him committing the killings, the trial court should have granted his motions for acquittal on these two counts. This court disagrees.

{¶ 41} A defendant's motions for acquittal should be denied if the evidence is such that reasonable minds could reach different conclusions as to

---

2. Although this case is not the subject of Ducic's appeal and is therefore not included in the record, the file in the instant case demonstrates that Ducic was charged with one count of intimidation and one count of retaliation.

whether each material element of the crimes has been proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 683 N.E.2d 1096; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492; *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184. The trial court is required to view the evidence in a light most favorable to the state. *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. Thus, circumstantial evidence alone may be used to support a murder conviction. *State v. Anderson* (May 12, 1994), Cuyahoga App. Nos. 65378, 65379, 1994 WL 189401.

{¶ 42} In this case, Weiss and Farrell testified that Ducic admitted committing both murders, explained his motives, told them the means by which he did so, and displayed not regret, but pride in both deeds. Their testimony concerning Ducic's admissions found support in the autopsy protocols, which detailed the particular drugs found in each victim, the circumstances surrounding each death, and other physical evidence presented in the case.

{¶ 43} Based upon the prodigious amount of evidence produced, the trial court correctly concluded that Ducic's guilt of the crimes was for the jury to determine. *State v. Gray*, Cuyahoga App. No. 83097, 2004-Ohio-1454, 2004 WL 584187. Ducic's first assignment of error, therefore, is overruled.

{¶ 44} Ducic next challenges the admission of evidence that he threatened Farrell. He argues the evidence contravened the stricture of Evid.R. 404(B).

{¶ 45} Apparently, Ducic believes that his failure to appeal his conviction in the second case prevents this court from considering the trial court's joinder of his indictment on charges of intimidation and retaliation with the charges in the instant case for purposes of trial. Such an assertion, however, is baseless; this court is neither so constricted nor so simple.

{¶ 46} Ducic's indictment on those charges was predicated upon the threats he made when he discovered that Farrell had reported his admissions about the murders. Since the evidence Ducic now challenges was presented to establish the elements of those charges and inextricably related to the charges made in the instant case, his argument with respect to Evid.R. 404(B) is not persuasive. *State v. Santiago*, Cuyahoga App. Nos. 78678, 78715, 2001 WL 1141381.

{¶ 47} Accordingly, Ducic's second assignment of error is overruled.

{¶ 48} Ducic challenges in his third assignment of error the trial court's decision to impose consecutive life sentences for his two aggravated murder convictions. He complains that the trial court failed to comply with "R.C. 2929.13(E)(4)." Presumably, Ducic means R.C. 2929.*14* (E)(4), which is the section that actually applies to consecutive sentences. Ducic's challenge is rejected.

{¶ 49} Together, R.C. 2929.14(E)(4) and R.C. 2929.19(B)(2) require the trial court to state certain findings and reasons before imposing consecutive sentences upon a defendant. The decision set forth in *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, further requires those findings and reasons to be delivered at the sentencing hearing.

{¶ 50} In *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, at paragraph two of the syllabus, the Supreme Court expressly stated that R.C. 2929.14(E)(4) applies to sentences for aggravated murder. A review of the transcript of Ducic's sentencing hearing demonstrates that the trial court fully complied with its statutory duties.

{¶ 51} The court stated that consecutive sentences were necessary to protect the public and to punish Ducic, that they were not disproportionate to the seriousness of his conduct and the danger he posed to the public, that Ducic had an extensive criminal record, and that anything other than consecutive terms would diminish the seriousness of his crimes. The trial court additionally reasoned that Ducic's lack of remorse, willingness to commit yet another murder after accepting $500 as a down payment, and demonstration that he was "[s]till the con man" justified the consecutive terms.

{¶ 52} Based upon the trial court's compliance with R.C. 2929.14(E)(4), Ducic's third assignment of error also is overruled.

{¶ 53} Ducic's convictions and sentences are affirmed.

Judgment affirmed.

BLACKMON, P.J., and GALLAGHER, J., concur.